**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| HONEYWELL AEROSPACE US LLC,<br><br>Plaintiff,<br><br>v.<br><br>LUCID GROUP, INC., and LUCID GROUP USA, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 2:26-CV-841<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

This case concerns Lucid's willful and unlicensed use of inventions that Honeywell Aerospace and its predecessors developed to solve exceptionally difficult problems the automotive industry has only recently confronted: how a vehicle perceives the world around it, tells its operator what it sees, warns of hazards before the operator can perceive them, and reports its own faults for repair. Honeywell Aerospace solved those problems years ago for aircraft. Lucid now sells vehicles that use those critical inventions without permission.

Honeywell Aerospace is one of the largest independent aerospace and defense suppliers in the world. It employs more than 36,000 people globally, operates more than 90 engineering, manufacturing, and maintenance facilities, and serves thousands of customers. Its systems and technologies are found on commercial air transport, business aviation, defense, and space platforms, and its parts are incorporated in a significant majority of the aircraft currently in service worldwide.

Honeywell Aerospace's engineering heritage begins with the invention of the world's first autopilot. On June 18, 1914, Lawrence Sperry[1] demonstrated a gyroscopic aircraft stabilizer by climbing out onto the wing of his aircraft with no one at the controls. Honeywell Aerospace's technologies have been on essentially every major platform of powered flight since.

Over the century that followed, Honeywell Aerospace and its predecessor companies introduced a series of category-defining systems, including the first commercial auxiliary power units in the 1950s, the Ground Proximity Warning System in the 1970s, the first integrated digital cockpits in the 1990s, the Runway Awareness and Advisory System (RAAS) and combined power and thermal management systems in the 2000s, and electromechanical control actuation in the 2010s.

Honeywell Aerospace's engineers did not confine their work to aircraft platforms. For decades, Honeywell Aerospace engineers developed technologies applicable to numerous fields, including perception and navigation systems for autonomous[2] and unmanned ground vehicles: land vehicles that had to detect the road surface, identify lane markings, distinguish traversable ground from obstacles, and control speed and steering in all types of road conditions.

Honeywell Aerospace's sustained record of innovation resulted in more than 9,500 active patent assets filed in approximately 30 countries. The inventions asserted in this Complaint come from that body of work.

Lucid has been on notice of Honeywell Aerospace's patents, including those asserted in this case, for years. But Lucid decided to ignore Honeywell Aerospace's patent rights. Honeywell

---

[1] The Sperry company, founded by Elmer and Lawrence Sperry, eventually became part of Honeywell through mergers and acquisitions.
[2] Autonomous vehicles are typically categorized by level, from Level 1 (driver assistance) all the way to Level 5 (full automation).

Aerospace therefore has no choice but to seek relief in this Court to address Lucid's willful patent infringement.

Plaintiff Honeywell Aerospace US LLC ("Honeywell Aerospace" or "Plaintiff"), by and through its undersigned counsel, files this Complaint for patent infringement against Defendants Lucid Group, Inc. and Lucid Group USA, Inc. (collectively "Lucid" or "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for infringement of United States Patent Nos. 7,088,264, 7,286,062, 7,840,352, 8,314,816, 8,364,334, 9,355,567 and 10,133,856 (collectively, the "Patents-in-Suit") under the Patent Laws of the United States, 35 U.S.C. § 271, *et seq*.

## THE PARTIES

2. Plaintiff Honeywell Aerospace is a Delaware limited liability company with its principal place of business at 1944 E. Sky Harbor Circle North, Phoenix, Arizona 85034. For purposes of this complaint, Honeywell Aerospace as used herein also includes the actions of its predecessors.

3. On information and belief, Defendant Lucid Group, Inc. is a Delaware corporation with its principal place of business at 7373 Gateway Blvd., Newark, California, 94560. On information and belief, Lucid Group, Inc. maintains a regular and established place of business at 7700 Windrose Ave. Ste. G172, Plano, TX 75024, and is the public parent of Lucid USA, Inc. and Lucid Group USA, Inc.

4. On information and belief, Defendant Lucid Group USA, Inc. is a Delaware corporation and a subsidiary of Lucid Group, Inc. Lucid Group USA, Inc. is registered to do business in Texas (Texas SOS File Number: 0803795303).

5. Defendants may be served through their registered agent for service in Delaware, the Corporation Service Company, located at 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

6. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7. This Court has personal jurisdiction over Lucid because Lucid has had sufficient minimum contacts with Texas and this District such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. In particular, Lucid has committed acts of infringement in violation of 35 U.S.C. § 271 in Texas, including in this District, and has placed Infringing Products into the stream of commerce, through an established distribution channel, with the knowledge and/or understanding that such products will be used and sold in this District. These acts caused and continue to cause injury to Honeywell Aerospace within this District and Lucid derives substantial revenue from interstate and international commerce and expects or should reasonably expect its actions to have consequences within this District.

8. Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

9. Lucid has committed acts of infringement in this District by making, using, offering for sale, selling, and/or importing products or services that infringe the Patents-in-Suit, or by inducing others to infringe the Patents-in-Suit. Lucid has regular and established places of business in this District. By way of example, Lucid maintains a store at 7700 Windrose Avenue, Suite G172, Plano, Texas 75024 (the "Plano Studio"). On information and belief, since at least November 2022, Lucid has, and continues to, use, demonstrate, and promote, the Infringing Products to customers

and prospective customers in this District through the Plano Studio, including through its Air and Gravity customer demo drives and vehicle presentations that practice the Accused Functionality.

10. Lucid does business in Texas through its subsidiaries, including through its subsidiary Lucid Group USA, Inc., which is registered to do business in Texas (Texas SOS File Number: 0803795303).

11. Lucid has acknowledged that Texas residents have expressed interest in Lucid vehicles through reservations, orders, customer inquiries, and visits to Lucid's website. Further, Lucid has represented that Texas residents may reserve Lucid vehicles through its website and arrange delivery to Lucid's Houston delivery center or directly to their homes in Texas. [*See* Ex. A-Lucid Complaint].

12. Lucid has also acknowledged that it operates a Houston service center, where it provides repair work and warranty services. Thus, Lucid's Texas-facing sales, delivery, and service activities are deliberate, ongoing commercial activities concerning the Infringing Products. [*See* Ex. A- (Lucid Complaint)].

13. In addition, Lucid's Texas operations are substantial and ongoing. Lucid has announced a new studio and delivery location in Dallas. [*See* Ex. B] Lucid is hiring Texas personnel for customer engagement, test drives, local marketing, vehicle inventory, vehicle preparation, vehicle intake, deliveries, and related operations. [*See* Ex. C-E] These additional Texas operations further confirm that Lucid's Texas presence is continuing and commercial in nature.

14. Moreover, Lucid has also announced plans to test Lucid Gravity vehicles in Houston through the Uber/Nuro robotaxi program. [*See* Ex. F-G] This activity further reflects Lucid's deliberate and continuing commercial and technological engagement with Texas.

15. Lucid has also litigated in this District without seeking transfer. *See, e.g., Integral Wireless Techs. LLC v. Lucid Group, Inc.*, Case No. 2:26-cv-198; *Wyoming Tech. Licensing, LLC v. Lucid Group, Inc.*, Case No. 2:26-cv-505.

16. Furthermore, Honeywell Aerospace's predecessor, Honeywell Technologies, maintains a significant technology operation in Richardson, Texas. The Richardson facility is one of two semiconductor wafer-fabrication facilities and designs, manufactures, and tests advanced sensors. Honeywell Technologies' substantial presence in this District, along with Honeywell Aerospace's continuing presence, further reinforces the local interest in adjudicating this dispute in this District.

## OVERVIEW OF THE PATENTED INVENTIONS

### U.S. Patent No. 7,088,264

17. On August 8, 2006, U.S. Patent No. 7,088,264 ("the '264 Patent"), entitled "Flight Safety System Monitoring Combinations of State Values," was duly and legally issued by the USPTO. A true and accurate copy of the '264 Patent is attached hereto as Exhibit H.

18. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '264 Patent, including the sole and exclusive right to prosecute this action and enforce the '264 Patent against infringers, and to collect damages for all relevant times.

19. Independent claim 1 of the '264 Patent recites a method comprising "monitoring values of states of the vehicle; comparing combinations of such values of states to known unsafe combinations; and identifying combinations of values of states of the vehicle that correspond to the unsafe combinations." '264 Patent, claim 1. Independent claim 24 recites a computer readable medium containing instructions for causing a computer to implement substantially the same method. *Id.*, claim 24.

20. The ’264 Patent states that although described embodiments are specific to flight safety systems, its methods and systems are not limited to any particular type of vehicle, describing a system that monitors states of “a vehicle such as an aircraft or other vehicle such as a spacecraft, or land-based vehicle.” *Id.*, 2:35-37.

21. As of March 14, 2002, conventional vehicle fault-detection systems evaluated sensor data one variable, or one sensor, at a time. A fault-detection system built on that architecture could identify a condition only if some individual sensor reading, considered alone, exceeded a defined threshold. Such a system could not identify a fault reflected only in a particular combination of readings across multiple sensors and commands, none of which was individually anomalous. *See id.*, 4:3-19.

22. The ’264 Patent addresses that deficiency by monitoring combinations of state values — which may include both sensed physical conditions and commands pending or being implemented by onboard computers or other devices — against a database of pre-identified combinations known to be unsafe or undesirable, and identifying when a vehicle’s current combination of states matches one of those known-unsafe combinations. The identification the claimed method performs is not a property of any individual monitored value; it exists only at the level of the combination, because the combination itself is what the system compares against the stored dataset. *See id.*, 3:10-4:26.

23. Claims 1 and 24 require this comparison to be performed continuously, in real time, across combinations of numerous sensed and commanded vehicle states, throughout ongoing vehicle operation. This is a task that a single-variable, threshold-based fault-detection architecture was not designed to perform—and could not perform—because such an architecture has no

mechanism for evaluating a combination of values against a stored set of known-unsafe combinations.

24. The claims of the ’264 Patent are not directed to a result achievable by unaided human observation. The claimed comparison — evaluating combinations of numerous sensed and commanded vehicle states against a stored dataset of known-unsafe combinations, continuously and in real time — has no counterpart in single-variable evaluation at any speed. An architecture that evaluates each sensed value against its own threshold does not reach the claimed identification more slowly; it does not reach it at all because the condition the claimed method identifies is a property of the combination and is absent from every constituent value considered on its own.

25. Moreover, the claims of the ’264 Patent are not directed to data processing untethered from vehicle hardware. The specification describes the corresponding architecture: a plurality of sensors distributed about the vehicle, providing state information to a states module that converts physical sensor signals into digital form for use by a processor, and a processor coupled to a database of pre-identified unsafe state combinations that performs the claimed comparison against real-time sensor and command data. *See id.*, 2:35-53 (describing various sensors, including speed sensors, and explaining that “The sensors are coupled to a states module 120 that is integrated with a processor 125”). Claims 3 and 25, for example, expressly recite such sensors. The claims are also confined to a particular implementation: they require that combinations of internal vehicle state values, including both sensed conditions and pending or executing commands, be compared against a stored dataset of pre-identified unsafe combinations.

26. The improvement claimed in the ’264 Patent is an improvement to the operation of the vehicle fault-detection system itself. The claimed system does not arrange the same sensor data differently. It computes a result — the identification of an unsafe combination of vehicle states —

that prior single-variable systems did not and could not compute, because that identification exists only at the level of the combination and has no counterpart in any individually evaluated sensor reading.

27. The combinations recited in the ’264 Patent claims were not well-understood, routine, or conventional as of March 14, 2002. Vehicle fault-detection systems of that era evaluated sensor data one variable, or one sensor, at a time, and could not identify a fault reflected only in a particular combination of readings across multiple sensors and commands, none of which was individually anomalous. Plaintiff is aware of no system, and no publication, predating that date that compared combinations of internal vehicle state values, including combinations of sensed conditions and operator commands, against a stored database of known unsafe combinations, in the manner the claims require.

28. The ’264 Patent claims new and improved vehicle fault-detection systems that address problems rooted in and arising from the inability of conventional, single-variable fault-detection systems to identify failure conditions revealed only by combinations of vehicle states.

29. USPTO Patent Examiner Hung T. Nguyen examined the application that issued as the ’264 Patent, which was filed on March 14, 2002. The technology disclosed and claimed in the ’264 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Nguyen never rejected the ’264 Patent claims as directed to patent-ineligible material at any time during the examination period. On February 21, 2006, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 7,286,062**

30. On October 23, 2007, U.S. Patent No. 7,286,062 ("the '062 Patent"), entitled "Perspective View Conformal Traffic Targets Display," was duly and legally issued by the USPTO. A true and accurate copy of the '062 Patent is attached hereto as Exhibit I.

31. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '062 Patent, including the sole and exclusive right to prosecute this action and enforce the '062 Patent against infringers, and to collect damages for all relevant times.

32. Independent claim 1 of the '062 Patent recites a display system comprising "a display screen for graphical display of data, one or more sensors for obtaining traffic data regarding traffic targets, one or more processors for receiving traffic data from the one or more sensors, and for providing input to the display screen, and the display screen displaying traffic targets as icons in a 3-dimensional graphical representation of real space, wherein the display size of the icons is selected from a finite set of sizes which correspond to a finite set of distance ranges based on the distance to the traffic targets, the set of distance ranges comprises one range, and the set of sizes comprises continuous size variations corresponding to distances within the one range, the size variations being bounded by a maximum and a minimum icon size." '062 Patent, claim 1.

33. As of June 29, 2005, systems that displayed traffic targets in a three-dimensional graphical representation rendered target icons either at a uniform size irrespective of range, or at a size that varied as an unbounded function of range. Neither approach constrained the rendered output. A uniform-size rendering encoded no range information in icon size at all. An unbounded proportional mapping drove icon size toward zero as target range increased and toward the full extent of the display as range decreased, so that at either extreme of the system's operating

envelope the rendered size of an icon no longer corresponded to a resolvable range value. *See id.*, 2:57-3:53.

34. The ’062 Patent addresses that deficiency by selecting each icon’s displayed size from a continuously varying range that is itself bounded by a defined maximum and minimum. *Id.*, claim 1. The claimed system thereby encodes each target’s sensed range in the rendered size of its icon, while constraining the rendered output so that the icon for a near target cannot exceed a defined maximum extent and the icon for a far target cannot fall below a defined minimum extent.

35. Claim 1’s requirement that the size variation be bounded by a maximum and a minimum is not an incidental display preference; it is the specific mechanism by which the claimed system resolves the tradeoff that a purely proportional, unbounded scaling approach could not resolve. The claim specifies the rule by which a computed quantity — each target’s sensed range — is mapped to a rendered display parameter: a continuous mapping across a single defined distance range, bounded at both ends. The claimed system does not relocate or reformat sensor data already available to it. It computes a display parameter that did not previously exist and applies that parameter to the rendered output.

36. The claims of the ’062 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires “a display screen for graphical display of data,” “one or more sensors for obtaining traffic data regarding traffic targets,” and “one or more processors for receiving traffic data from the one or more sensors, and for providing input to the display screen.” *Id.*, claim 1. The specification describes the corresponding architecture: a processor coupled to the display screen and to one or more sensors, configured to calculate each target’s distance and to select and update the corresponding icon size within the claimed bounded

range as that distance changes. *See id.*, 6:16-40 ("Traffic sensors 602 include any number of receivers, infrared lasers, millimeter wave cameras or other sensor elements for obtaining traffic data regarding traffic targets. In some embodiments, traffic data includes data about a target's location, speed, size, and trajectory." "Processor 604 analyzes the data received from traffic sensors 602 and determines if the traffic targets are located within the field of view." "Processor 604 also calculates the display icon size of targets.").

37. The improvement claimed in the '062 Patent is an improvement to the operation of the display system itself. The claimed system does not arrange the same sensor data differently. It computes a bounded, distance-correlated icon size — a display parameter that prior systems did not compute in this manner — and applies that computed size to the displayed representation of each detected target, constraining the rendered icon size to remain within the defined maximum and minimum at every range within the recited distance range.

38. The bounded mapping recited in claim 1 also improves the operation of the display system's processor. Because icon size is selected from a range bounded at both ends rather than recomputed as an unbounded conformal projection for every target at every refresh, the claimed mapping reduces the computational cost of the icon-sizing operation itself. The specification identifies this as an advantage of the claimed approach, stating that the claimed layered conformal view "reduces the load placed on the processor" in determining icon size and allows the processor to "work more efficiently on other tasks." '062 Patent, 3:49-53. The claimed advance is therefore an improvement to the functioning of the display system itself, and not the invocation of a computer as a tool for presenting information.

39. The combinations recited in the '062 Patent claims were not well-understood, routine, or conventional as of June 29, 2005. Systems that displayed traffic targets in a three-

dimensional graphical representation of that era either rendered all targets at a uniform size or scaled icon size as an unbounded function of range, and did not constrain the rendered icon size within a defined maximum and minimum across a single distance range. Plaintiff is aware of no system, and no publication, predating that date that displayed traffic targets at a variable size within a single defined distance range and bounded by a defined maximum and minimum icon size, in the manner the claims require.

40. The ’062 Patent claims new and improved traffic display systems that address problems rooted in and arising from the inability of conventional rendering approaches to encode sensed target range within a bounded display envelope, and from the processing load that unbounded conformal scaling imposed on the display system’s processor.

41. USPTO Patent Examiner Anne Viet Nga Lai examined the application that issued as the ’062 Patent, which was filed on June 29, 2005. The technology disclosed and claimed in the ’062 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Lai never rejected the ’062 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 3, 2007, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 7,840,352**

On November 23, 2010, U.S. Patent No. 7,840,352 (“the ’352 Patent”), entitled “Method and System for Autonomous Vehicle Navigation,” was duly and legally issued by the USPTO. A true and accurate copy of the ’352 Patent is attached hereto as Exhibit IJ.

42. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’352 Patent, including the sole and exclusive right to prosecute this action and enforce the ’352 Patent against infringers, and to collect damages for all relevant times.

43. Independent claim 1 of the ’352 Patent recites “providing one or more Global Positioning System (GPS) sensors, one or more inertial sensors, and one or more image sensors on an autonomous vehicle; obtaining one or more GPS measurements, one or more inertial measurements, and one or more image measurements from the respective GPS sensors, inertial sensors, and image sensors during operation of the autonomous vehicle; integrating together each of the GPS measurements, inertial measurements, and image measurements; and estimating a position of the autonomous vehicle over time based on the integration.” ’352 Patent, claim 1. Independent claim 13 recites a corresponding system, and independent claim 20 recites a corresponding computer-readable medium, each reciting “performing a deep integration” of the GPS, inertial, and image measurements and “estimating a position of the autonomous vehicle over time based on the deep integration.” The specification defines the integration the claims require by reference to specific raw sensor outputs: pseudoranges from the GPS sensors, angular velocities from gyroscopes or linear accelerations from accelerometers from the inertial sensors, and angles to objects observed in images from the image sensors. ’352 Patent, 3:1-8. Claims 5, 6, and 7 recite those same measurement types expressly. *Id.*, claims 13, 20.

44. As of September 5, 2006, autonomous vehicle position estimation using GPS, inertial, or image measurements individually was understood to be limited: GPS-based estimates could be disrupted by insufficient satellite visibility, inertial-measurement-based estimates accumulated error over time, and image-based estimates likewise accumulated error, including gross errors from image-matching failures. Some prior approaches combined estimates from only two of these three measurement types, or independently estimated position from each measurement type and subsequently merged the resulting independent estimates using an ad hoc method such as averaging. *See id.*, 1:6-45.

45. The ’352 Patent addresses those limitations through integration, including “deep integration” — finding a single position estimate that is consistent with the raw measurements from all three sensor types, rather than independently estimating position from each type and merging the results afterward. Because the estimate is calculated by jointly processing the raw measurements—rather than by computing three separate estimates from GPS, inertial, and image data—the claimed method can still produce an accurate result even when each individual estimate contains errors and cannot be reliably merged. The specification explains that independent estimation and merging cannot consistently achieve the level of reliability offered through the technology the ’352 Patent provides. *See id.*, 2:26-3:14.

46. Claims 1, 13, and 20 require integrated processing of raw measurements from a specifically defined set of three sensor types, not the collection of position-related data from each sensor followed by display or combination of independently-derived results. The claimed integration is the specific mechanism by which the method achieves a position estimate not obtainable by combining the outputs of three sensors processed independently of one another.

47. The claims of the ’352 Patent are not implemented on generic sensors performing generic functions. Claim 1 requires “one or more Global Positioning System (GPS) sensors, one or more inertial sensors, and one or more image sensors on an autonomous vehicle.” *Id.*, claim 1. Claim 13 requires a corresponding system, including each of these three specific sensor types coupled to a processor configured to perform the recited integration. *Id.*, claim 13. The specification describes the corresponding architecture: a processor coupled to the GPS sensor(s), the inertial sensor(s), and the image sensor(s), configured to jointly integrate the measurements obtained from all three into a single position estimate. The claimed advance does not reside in the computing hardware. It resides in the requirement that measurements from three specified and

distinct sensor modalities be integrated with one another at the measurement level. Claim 1 requires integrating together the GPS, inertial and image measurements themselves, and estimating position "based on the integration" of those measurements — not the merger of three position estimates derived independently from them. *See id.* at FIG. 1.

48. The improvement claimed in the '352 Patent is an improvement to the operation of the vehicle navigation system itself. The claimed system does not arrange the same sensor data differently. It computes a position estimate that prior systems did not and could not compute through independent estimation and merging, because the estimate is derived from the joint integration of measurements from all three sensor types rather than from a combination of three independently derived results.

49. The combinations recited in the '352 Patent claims were not well-understood, routine, or conventional as of September 5, 2006. Autonomous vehicle position-estimation systems of that era obtained GPS, inertial, or image measurements and in some cases combined estimates from two of the three measurement types, but did not jointly integrate measurements from all three types into a single position estimate. Plaintiff is aware of no system, and no publication, predating that date that jointly integrated raw measurements from all three types into a single position estimate, in the manner the claims require.

50. The '352 Patent claims new and improved autonomous vehicle navigation systems that address problems rooted in, and arising from, the accumulation of error inherent in position estimates derived independently from GPS, inertial, or image measurements alone.

51. USPTO Patent Examiner Yonel Beaulieu examined the application that issued as the '352 Patent, which was filed on September 5, 2006. The technology disclosed and claimed in the '352 Patent was not well understood, routine, or conventional at the time of the invention. The

claims were examined and allowed over the prior art of record. On June 25, 2010, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 8,314,816**

On November 20, 2012, U.S. Patent No. 8,314,816 ("the '816 Patent"), entitled "System and Method for Displaying Information on a Display Element," was duly and legally issued by the USPTO. A true and accurate copy of the '816 Patent is attached hereto as Exhibit K.

52. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '816 Patent, including the sole and exclusive right to prosecute this action and enforce the '816 Patent against infringers, and to collect damages for all relevant times.

53. Independent claim 1 of the '816 Patent recites a method comprising "obtaining first range data for an object located in a sensing region at a first sampling time; obtaining image data corresponding to an image of the object at the sampling time; detecting low visibility conditions associated with the sensing region; acquiring second range data for the object at a second sampling time that occurs after the first sampling time; processing the image data and the second range data to generate image graphics content for a predicted image that corresponds to a simulated view of the object at the second sampling time; and rendering the image graphics content on the display element." '816 Patent, claim 1. Independent claim 14 recites a corresponding display system, including an onboard display element, an onboard ranging system, an onboard imaging system, at least one processor, and a graphics system, each cooperatively configured to perform corresponding operations. *Id.*, claim 14.

54. The '816 Patent states that "although the display system 100 is described herein in an aviation context, the display system 100 may be located onboard and/or associated with other

vehicles, such as ground-based vehicles or maritime vessels." *Id.* at 4:40-43. Consistent with that disclosure, claim 1 is not limited to any vehicle, and claim 14 is directed to a vehicle of any type.

55. As of June 8, 2009, sensor-fusion display systems combined range data (e.g., from radar) with image data (e.g., from a camera) to render a correlated view of a sensed object. Real-time imaging systems had difficulty capturing accurate, detailed, and meaningful images under low-visibility conditions, and displays that depended on real-time image data for the image-related component of that correlated view were accordingly limited in their ability to render an accurate, current view of a sensed object once visibility degraded. *See id.*, 11:20-31. Conventional ranging systems, such as radar, could operate well in low-visibility conditions, but the graphical information they produced was visually noisy or low resolution and often failed to accurately represent an object's size, shape, or other visually distinguishable features, rendering objects in a graphically ambiguous manner. A ranging system alone yielded a likely location for an object, but not data from which the object's type or configuration could be rendered. Moreover, where a ranging sensor's sampling rate was too low relative to the speed of a moving object, the object could appear to jump, blur, or be rendered at an exaggerated size on the display. Range data therefore did not provide a technical substitute for image data once real-time imaging became unreliable. A range-only rendering did not reproduce an object's size, shape, or visually distinguishable features, and so could not supply the image-related component of the correlated view that such display systems were built to render. *See id.*, 1:60-2:14.

56. The '816 Patent addresses that deficiency by detecting low visibility conditions and, upon detection, generating a predicted image of the sensed object from previously obtained (buffered) image data combined with newly-acquired range data, rather than continuing to rely on the imaging system's current, potentially unreliable output. *Id.*, claims 1, 14. The predicted image

is generated to correspond to a simulated view of the object as it would appear at the later sampling time, compensating for movement of the object, the vehicle, or both, that occurred between the two sampling times. *See id.*, 11:13-42.

57. Claim 1, for example, requires this specific sequence, not merely the display of correlated range and image data generally: obtaining range and image data at a first time, detecting low visibility, and only then acquiring updated range data and generating a predicted image from the combination of the buffered image data and that updated range data. The claimed method does not simply combine the most recently available range and image data; it substitutes a specifically derived predicted image for real-time image data once a specific triggering condition — detected low visibility — has occurred. Claim 1 therefore recites a specific rule rather than a desired outcome stated at a level of generality that would cover any means of achieving it. The claim specifies what triggers the substitution (detected low visibility conditions associated with the sensing region), which inputs the substitute image must be generated from (the image data obtained at the first sampling time together with the range data acquired at the second), and what the generated image must correspond to (a simulated view of the object at the second sampling time). *Id.*, claim 1.

58. The claims of the ’816 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires that data be obtained by various sensors, and expressly recites a “sensing region” for which data is obtained. Claim 14 requires “an onboard display element,” “an onboard ranging system,” “an onboard imaging system,” “at least one processor,” and “a graphics system,” each cooperatively configured to perform the recited operations. *Id.*, claim 14. The ’816 Patent describes the corresponding architecture including specific sensors to be used depending on the particular implementation. *See id.*, 5:38-63 (“the

imaging system 106 may include a video camera, a still camera, an infrared camera or imaging device, a millimeter wave imager, a charge-coupled device (CCD)"), 6:23-48 ("the ranging system 108 may include a radar system (e.g., millimeter wave radar or x-band radar), a lidar system, an acoustic ranging system, an ultrasonic ranging system"). Claims 2-6 and 15, for example, further recite such sensors.

59. The improvement claimed in the '816 Patent is an improvement to the operation of the display system itself. The claimed system does not simply display whatever image data is currently available. It generates a predicted image from buffered data specifically when real-time image data becomes unreliable, and renders that predicted image spatially and temporally correlated with updated range data — a display capability that prior systems, dependent on real-time image data alone, did not have. *Id.*, claims 1, 14.

60. The combinations recited in the '816 Patent claims were not well-understood, routine, or conventional as of June 8, 2009. Sensor-fusion display systems of that era rendered a correlated display of range and image data obtained substantially concurrently, and depended on the continued reliability of real-time image data to do so. Plaintiff is aware of no system, and no publication, predating that date that detected low visibility conditions and, in response, generated a predicted image from previously obtained image data combined with updated range data for display, in the manner the claims require.

61. The '816 Patent claims new and improved display systems for a vehicle that address problems rooted in and arising from the dependence of prior sensor-fusion displays on real-time image data that becomes unreliable under degraded visibility conditions.

62. USPTO Patent Examiner Ryan R. Yang examined the application that issued as the '816 Patent, which was filed on June 8, 2009. The technology disclosed and claimed in the '816

Patent was not well understood, routine, or conventional at the time of the invention. Examiner Yang never rejected the ’816 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 17, 2012, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 8,364,334**

On January 29, 2013, U.S. Patent No. 8,364,334 (“the ’334 Patent”), entitled “System and Method for Navigating an Autonomous Vehicle Using Laser Detection and Ranging,” was duly and legally issued by the USPTO. A true and accurate copy of the ’334 Patent is attached hereto as Exhibit L.

63. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’334 Patent, including the sole and exclusive right to prosecute this action and enforce the ’334 Patent against infringers, and to collect damages for all relevant times.

64. Independent claim 1 of the ’334 Patent recites a system comprising “at least one laser scanner configured to perform one or more range and intensity scans of an area around the autonomous vehicle; a geo-location unit for the autonomous vehicle, the geo-location unit comprising one or more global positioning system sensors, and one or more inertial navigation system sensors; and at least one processor in operative communication with the laser scanner and the geo-location unit, the processor configured to execute one or more program modules comprising: a ground plane-based processing module configured to receive range scan data transformed into world coordinates, and output ground plane-based classification data; a range-based processing module configured to receive data from a single range scan, and output range-based classification data; an intensity-based processing module configured to receive intensity scan data, and output intensity-based classification data; and a classification fusion module

configured to receive the classification data from each of the processing modules, and output range bin classification data." '334 Patent, claim 1. Independent claim 13 recites a corresponding method. *Id.*, claim 13.

65. As of October 30, 2008, autonomous ground vehicle navigation systems using laser range scanning classified detected range data using either a single scan in isolation or a history of prior scans, but did so through a single classification approach applied to the range data as a whole. *See id.*, 1:46-2:6. Such systems did not separately classify the same scan data along multiple independent dimensions — the accumulated history of the road surface, the geometry of a single scan, and the reflectance intensity of the scanned surface — and then combine the results of those separate classifications into a single output.

66. The '334 Patent addresses that architecture by processing the same range and intensity scan data through three independently configured processing modules: a ground plane-based module that classifies range bins using an accumulated history of prior scans, a range-based module that classifies range bins using only the current, single scan, and an intensity-based module that classifies range bins using the reflectance intensity of the scanned surface. A classification fusion module then receives the classification output of each of the three modules and generates a final range bin classification from the combination.

67. Claim 1 requires this specific multi-module architecture, not the classification of laser scan data generally. It requires that a ground plane-based module, a range-based module, and an intensity-based module each independently output classification data, and that a separate classification fusion module receive and combine the output of each of the three. *Id.*, claim 1. This ordered combination allows the system to identify road elements, curbs, and obstacles with a reliability that no single classification approach, standing alone, can achieve. The claims do not

preempt laser-based classification of a vehicle's surroundings. A system that classifies scan data through a single approach, or through any arrangement other than three separately recited classification modules feeding a distinct classification fusion module, falls outside claim 1.

68. The claims of the '334 Patent are not implemented on generic sensors performing generic functions. Claim 1, for example, requires "at least one laser scanner," "a geo-location unit... comprising one or more global positioning system sensors, and one or more inertial navigation system sensors," and "at least one processor... configured to execute" the four specifically recited program modules, each of which the claim defines by the specific input it receives and the specific output it produces: the ground plane-based module receives range scan data transformed into world coordinates and outputs ground plane-based classification data; the range-based module receives data from a single-range scan and outputs range-based classification data; the intensity-based module receives intensity scan data and outputs intensity-based classification data; and the classification fusion module receives the classification data from each of the other three and outputs range bin classification data. The architecture, and the flow of data through it, are recited in the claim itself rather than left to the implementer. *Id.*, claim 1.

69. The improvement claimed in the '334 Patent is an improvement to the operation of the vehicle navigation system itself. The claimed system does not classify the same range and intensity data using a single classification approach. It independently derives classification data along three separate dimensions from the same underlying scan data, and combines the three independently derived classifications into a single result.

70. The combinations recited in the '334 Patent claims were not well-understood, routine, or conventional as of October 30, 2008. Autonomous ground vehicle navigation systems of that era classified laser range scan data using a single classification approach applied to the scan

data as a whole. Plaintiff is aware of no system, and no publication, predating that date that separately derived classification data from a ground plane-based module, a range-based module, and an intensity-based module, and combined that classification data through a classification fusion module.

71. The ’334 Patent claims new and improved autonomous vehicle navigation systems that address problems rooted in and arising from the reliance of prior laser-based navigation systems on a single form of range scan classification.

72. USPTO Patent Examiner Truc M. Do examined the application that issued as the ’334 Patent, which was filed on October 30, 2008. The technology disclosed and claimed in the ’334 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Do never rejected the ’334 Patent claims as directed to patent-ineligible material at any time during the examination period. On November 9, 2012, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 9,355,567**

On May 31, 2016, U.S. Patent No. 9,355,567 (“the ’567 Patent”), entitled “System and Method for Highlighting an Area Encompassing an Aircraft That Is Free of Hazards,” was duly and legally issued by the USPTO. A true and accurate copy of the ’567 Patent is attached hereto as Exhibit M.

73. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’567 Patent, including the sole and exclusive right to prosecute this action and enforce the ’567 Patent against infringers, and to collect damages for all relevant times.

74. Independent claim 1 of the ’567 Patent recites: A method for indicating a hazard free area around a vehicle on a moving map, the vehicle comprising a type, comprising: displaying

an icon representing the vehicle on the moving map; displaying a swath icon on the moving map, the swath icon depicting a zone around the icon representing the vehicle, the swath icon representing an object free area around the vehicle; detecting, based on a signal provided by a sensor on the vehicle, an object moving in the vicinity of the vehicle; displaying the detected object on the moving map; recognizing a maneuver the vehicle may take to avoid a collision with the detected object, based on the detected object, the moving map, and the vehicle type; displaying a second icon indicating the maneuver; and modifying the swath icon to contract based on a position of the detected object within a first threshold distance of the vehicle. '567 Patent, claim 1.

75. The '567 Patent states that although the described embodiments are specific to aircraft display systems, "principles of the inventive subject matter may be applied to other vehicle display systems." *Id.*, 4:26-29. Consistent with that disclosure, claim 1 is directed to a vehicle of any type and recites the vehicle type as an operative input to the claimed method.

76. As of August 8, 2013, moving-map display systems for vehicles operating in proximity to obstacles rendered the positions of detected objects as discrete symbology superimposed on a map of the operating surface. *See id.*, 1:21-29. Those systems rendered where objects were located. They did not render the extent of the region around the vehicle that remained clear of detected objects, because they did not compute it. That region was not data in the moving-map database, was not an output of the object-detection sensors, and was not represented by any display element in those systems.

77. The '567 Patent addresses that deficiency by introducing a display element of a different kind and specifying the rules that govern its geometry and its behavior. The swath icon recited in claim 1 does not depict a detected object, a surface feature, or any other datum present in the underlying moving-map data. It depicts a computed region — the zone around the vehicle

that is free of detected objects. *Id.*, claim 1. The geometry of that region is computed rather than retrieved: the specification describes the swath icon as drawn based on the position of detected obstacles, and describes its width as determined in part by the width of the surface the vehicle occupies. *Id.*, 7:22-25.

78. Claim 1 requires that the swath icon be "modif[ied] . . . to contract based on a position of the detected object within a first threshold distance of the vehicle." *Id.*, claim 1. The recited display element is therefore not fixed. Its depicted extent is a function of sensed object position. *See id.*, 7:34-37 ("If the obstacle 208 is close to the wingtip, the swath icon 202 in the corresponding side 222 will move closer to the aircraft 204"). The contraction is itself an output of the claimed method: the reduction of the rendered object-free zone occurs in the same spatial frame and the same coordinate system as the icon representing the vehicle and the icon representing the detected object, rather than in a separate indicator requiring independent interpretation.

79. Claim 1 further requires "recognizing a maneuver the vehicle may take to avoid a collision with the detected object, based on the detected object, the moving map, and the vehicle type," and requires "displaying a second icon indicating the maneuver." *Id.*, claim 1. Claim 1 does not recite collision avoidance as an objective while leaving the manner of achieving it unspecified. It requires that the maneuver be recognized from three enumerated inputs and that a second icon indicating the recognized maneuver be displayed. The specification describes that determination in the same terms, explaining that the system recognizes available routes based on detected obstacle information, the moving map database, and vehicle type, and displays an indication of the resulting maneuver. *Id.*, 7:55-60 ("the system recognizes exit routes based on adjacent obstacles information, the airport moving map database, and aircraft type and provides an arrow 426"); *see*

*also id.*, 8:12-20 ("the system recognizes exit routes based on adjacent obstacles information, the airport moving map database, and aircraft type and provides an arrow 726"). The requirement that vehicle type be an input reflects a physical constraint: the maneuvering envelope of a vehicle — its width, its turning radius, its stopping distance — determines which avoidance maneuvers are geometrically available to it, and a maneuver recognized without reference to that envelope may be one the vehicle cannot execute.

80. The claims of the '567 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires that the object be detected "based on a signal provided by a sensor on the vehicle," and requires that the detected object be a moving object. *Id.*, claim 1. Claim 14 requires a display, a sensor on the vehicle configured to sense a moving object, a synthetic vision system configured to provide the moving map, and a processor coupled to each of the three and configured to perform the recited operations. *Id.*, claim 14. The specification describes the corresponding architecture, including a dedicated object-detection sensor and a processor communicatively coupled to that sensor, to the synthetic vision system, and to the display unit. *Id.*, FIG. 1, 5:33-38 ("The ground status sensor 18 senses hazards such as objects near the aircraft and includes, for example, a radar"); *id.*, 6:10-12 ("Processor 24 is communicatively coupled to the EVS 12, GPS/avionics sensors 14, the SVS 16, and the ground status sensor 18").

81. The improvement claimed in the '567 Patent is an improvement to the operation of the vehicle display system itself. The claimed system does not arrange the same data differently. It computes a quantity that prior systems did not compute — the boundary of the object-free region — renders that quantity as a defined display element, and contracts that element as detected objects move relative to the vehicle. *Id.*, claim 1.

82. The combinations recited in the ’567 Patent claims were not well-understood, routine, or conventional as of August 8, 2013. Moving-map and proximity systems of that era detected objects, displayed their positions, and in some cases issued a warning when a detected object came within a threshold distance. Plaintiff is aware of no system, and no publication, predating August 8, 2013 that (i) rendered a computed object-free zone as a display element distinct from the elements representing detected objects and surface features, (ii) contracted that element based on the position of a detected moving object within a threshold distance of the vehicle, and (iii) recognized an available avoidance maneuver from the detected object, the moving map, and the vehicle type, and displayed a second icon indicating that maneuver, in the manner the claims require.

83. The ’567 Patent claims new and improved hazard-display systems for a vehicle that address problems rooted in and arising from the inability of conventional moving-map systems to compute or render the extent of the region around a vehicle that is free of detected objects, or to deform that rendered region as detected objects move relative to the vehicle.

84. USPTO Patent Examiner Ana D. Thomas examined the application that issued as the ’567 Patent, which was filed on August 8, 2013. The technology disclosed and claimed in the ’567 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Thomas never rejected the ’567 Patent claims as directed to patent-ineligible material at any time during the examination period. On March 14, 2016, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 10,133,856**

85. On November 20, 2018, U.S. Patent No. 10,133,856 ("the '856 Patent"), entitled "Method and System for Managing Software License for Vehicle," was duly and legally issued by the USPTO. A true and accurate copy of the '856 Patent is attached hereto as Exhibit N.

86. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '856 Patent, including the sole and exclusive right to prosecute this action and enforce the '856 Patent against infringers, and to collect damages for all relevant times.

87. Independent claim 1 of the '856 Patent recites a method comprising "receiving, by a processor, license term data of the license, the license term data including an expiration time limit of the license; observing, by a sensor, a condition of the vehicle; determining, by the processor, an operating state of the vehicle based on the condition observed by the sensor; and determining, by the processor, whether to deny access to the software module according to the expiration time limit based on the determined operating state." '856 Patent, claim 1. Independent claim 10 recites a corresponding system, including a processor and a sensor cooperatively configured to perform corresponding operations. *Id.*, claim 10.

88. The '856 Patent states that although the described embodiments are specific to aircraft systems, "it will be appreciated that the system 100 may be configured for software management for other types of vehicles (e.g., helicopters, cars, trucks, motorcycles, etc.) without departing from the scope of the present disclosure." *Id.*, 4:67-5:4. Consistent with that disclosure, claims 1 and 10 are directed to a vehicle of any type.

89. As of November 7, 2016, systems that managed the expiration of a software license enforced that expiration according to a fixed time limit, without regard to whether the licensed software was actively being relied upon for the operation of the vehicle at the moment the time

limit was reached. Such systems had no mechanism for determining the vehicle's operating state and using that determination to decide when to enforce a license's expiration. That architecture presented a technical problem. A license term that elapsed while the vehicle was in operation would withdraw access to a software module at a moment fixed by a clock, without regard to whether that module was then being relied upon in the operation of the vehicle.

90. The '856 Patent addresses that deficiency by observing a condition of the vehicle via a sensor, determining the vehicle's operating state from that observed condition, and determining whether to deny access to a licensed software module according to the license's expiration time limit based specifically on that determined operating state — allowing enforcement of the expiration to depend on whether the vehicle is currently in a state in which denying access would be appropriate.

91. Claim 1 requires this specific conditional structure, not merely the tracking of a license expiration date generally. It requires observing a vehicle condition via a sensor, determining an operating state from that observation, and conditioning the decision whether to deny access to the software module on the determined operating state — a decision structure in which the same expiration time limit can result in different access outcomes depending on the vehicle's operating state at the relevant time.

92. The claims of the '856 Patent are not directed to the administration of licensing rights in the abstract. Claim 1 conditions the access determination on a physical measurement: a sensor must observe a condition of the vehicle, and the vehicle's operating state must be determined from that observed condition before any determination whether to deny access is made. Claim 1 requires that license term data be received by a processor, that a condition of the vehicle be observed by a sensor, and that the processor determine an operating state of the vehicle and

whether to deny access to a software module. Claim 10 requires "a processor configured to receive license term data of the license," "a sensor configured to observe a condition of the vehicle," and the same processor further configured to determine the vehicle's operating state from the sensor's observation and to determine whether to deny access based on the expiration time limit and that determined operating state. *Id.*, claim 10. *See also id.*, FIG 2 (depicting a processor and specific types of sensors). The claimed method accordingly cannot be performed by a system that measures a license term against a clock or a calendar, however that system is implemented. It requires sensing a physical condition of the vehicle and deriving the vehicle's operating state from that sensed condition.

93. The improvement claimed in the '856 Patent is an improvement to the operation of the vehicle's software licensing system itself. The claimed system does not simply deny access once a stored expiration date is reached. It determines the vehicle's current operating state from sensor data and uses that determination, together with the expiration time limit, to decide whether denying access is appropriate at that time — a licensing decision that depends on real-time vehicle operating state, which fixed-expiration licensing systems did not perform. *Id.*, claims 1, 10.

94. The combinations recited in the '856 Patent claims were not well-understood, routine, or conventional as of November 7, 2016. Software license management systems of that era enforced license expiration according to a fixed time limit, without regard to the operating state of the vehicle on which the licensed software was running. Plaintiff is aware of no system, and no publication, predating that date that observed a vehicle's condition via a sensor, determined the vehicle's operating state from that observation, and determined whether to deny access to a licensed software module according to an expiration time limit based on that determined operating state, in the manner the claims require.

95. The ’856 Patent claims new and improved systems and methods for managing software licenses for a vehicle that address problems rooted in and arising from the inability of fixed-expiration licensing systems to account for whether licensed software is actively relied upon for vehicle operation at the time of expiration.

96. USPTO Patent Examiner Robert T. Nguyen examined the application that issued as the ’856 Patent, which was filed on November 7, 2016. The technology disclosed and claimed in the ’856 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Nguyen never rejected the ’856 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 25, 2018, the USPTO issued a Notice of Allowance for all pending claims.

## LUCID’S INFRINGING PRODUCTS

97. Lucid is an automotive technology company that develops and manufactures electric vehicles, as well as vertically integrated technologies and services, including its software-defined vehicle platforms, software and hardware architecture, autonomous driving platform, EV powertrains, and battery platforms.[3]

98. Lucid launched its consumer vehicle business with the Lucid Air sedan in 2021, and later released the Lucid Gravity, an SUV, in 2024.[4] The Lucid Air sedan and Lucid Gravity SUV vehicles are shown below[5]:

[3] Form 10-K, Lucid Group, Inc., Annual report for year ending December 31, 2025, p. 6 (February 24, 2026).
[4] *Id.*
[5] https://lucidmotors.com/ (accessed Sept. 11, 2026).




99. The Air and Gravity are equipped with technology including a zonal network architecture, electric powertrains and chassis, the Lucid DreamDrive Platform, and digital user experience management via Lucid Assistant. These technologies can continuously improve and expand functionality through cloud-enabled over-the-air updates.[6]

100. Each Lucid vehicle now comes standard with Lucid's 3D Surround View Monitoring with Blind Spot Display, Adaptive Cruise Control, Automatic Park In & Out, Front & Rear Cross Traffic Protection, Blind Spot Warning, Automatic Emergency Braking, and more.[7]

101. Lucid Air first became available to customers in October 2021.[8] Lucid's Air sedan is pictured below:

---

[6] Form 10-K, Lucid Group Inc., Annual report for year ending December 31, 2025, p. 6 (February 24, 2026).
[7] https://lucidmotors.com/air-pure (accessed Sept. 11, 2026).
[8] Form 10-K, Lucid Group, Inc., Annual report for year ending December 31, 2025, p. 10 (February 24, 2026).




102. At the time of purchase, Lucid Air vehicles could be equipped with DreamDrive, DreamDrive Premium, or DreamDrive Pro.[9]

| Level | Description | Features |
|---|---|---|
| DreamDrive | • 20 sensors and cameras<br>• Base level in Lucid Air before model year 2025 | • Adaptive Cruise Control<br>• Auto Park<br>• Park Distance Warning<br>• Rear Parking Protection<br>• Lane Departure Protection<br>• Forward Collision Protection<br>• Automatic Emergency Braking<br>• Cross Traffic Protection<br>• Rear Pedestrian Collision Protection<br>• Blind Spot Warning<br>• Traffic Sign Recognition<br>• Traffic Drive-Off Alert<br>• Rear View Monitoring<br>• Distracted Driver Alert<br>• Drowsy Driver Alert |
| DreamDrive Premium | • 24 sensors and cameras<br>• Base level in Lucid Air as of model year 2025 | All the features included in DreamDrive, plus Surround View Monitoring for real-time 3D vehicle visualization on the Pilot Panel, Blind Spot Display. |
| DreamDrive Pro | • Lucid Air's most advanced ADAS level with semi-autonomous driving features<br>• This is an optional feature | All the features included in DreamDrive Premium, plus **Hands-Free Drive Assist**, Lucid's Level 2 ADAS feature, Hands-Free Lane Change Assist, and Curb Rash Alert. |

103. The Lucid DreamDrive platform includes a sensor suite, high on-board computing power, back-up systems for ADAS and, over time, increased levels of automation. With up to 32 ADAS sensors onboard, the Lucid DreamDrive platform includes certain features with Level 2

[9] https://lucidmotors.com/knowledge/vehicles/air/lucid-air-in-depth/dreamdrive (accessed Sept. 11, 2026).

ADAS functionality and is capable of software upgrades via over-the-air ("OTA") updates.[10]

104. For example, in August 2025, Lucid released an OTA update to the Lucid Air, which included Hands-Free Driving Assist and Hands-Free Lane Change Assist features.[11]

105. Lucid Air's DreamDrive suite of hardware consists of up to 18 sensors on all sides, including short- and long-range radar and ultrasonic sensors. DreamDrive Pro also has forward-facing LiDAR to detect objects and their speed and trajectory. The data from these sensors is sent to Lucid Air's onboard computers so the vehicle can help steer, control speed and following distance, and alert the driver to potential hazards or dangerous driving conditions.[12]



106. Lucid Air's DreamDrive also has up to 14 interior and exterior cameras, depending on the level of DreamDrive the vehicle is equipped with. These cameras can detect the driver while driving, capture narrow and wide angles outside the vehicle, and power 360-degree Surround View

[10] Form 10-K, Lucid Group, Inc., Annual report for year ending December 31, 2025, p. 12 (February 24, 2026).
[11] *Id.*
[12] https://lucidmotors.com/knowledge/vehicles/air/lucid-air-in-depth/dreamdrive#dreamdrive-levels-whats-the-difference (accessed Sept. 11, 2026).

Monitoring. Lucid Air uses the real-time data from these cameras to power its advanced driver assistance system ("ADAS").[13]



107. Lucid DreamDrive includes: Adaptive Cruise Control, Auto Park, Park Distance Warning, Rear Parking Protection, Lane Departure Protection, Forward Collision Protection, Automatic Emergency Braking, Cross Traffic Protection, Rear Pedestrian Collision Protection, Blind Spot Warning, Traffic Sign Recognition, Traffic Drive-Off Alert, Rear View Monitoring, Distracted Driver Alert, Drowsy Driver Alert.[14]

108. DreamDrive Premium includes all the features included in DreamDrive, plus Surround View Monitoring for real-time 3D vehicle visualization on the Pilot Panel, and Blind Spot Display.[15]

109. DreamDrive Pro includes all the features included in DreamDrive Premium, plus Hands-Free Drive Assist, Hands-Free Lane Change Assist, and Curb Rash Alert.[16]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

110. Lucid's Gravity SUV, which began production in 2024, comes equipped with Lucid's DreamDrive 2 platform.[17] Lucid's Gravity SUV is pictured below:




111. At the time of purchase, Lucid Gravity could be configured with DreamDrive 2, DreamDrive 2 Premium, or DreamDrive 2 Pro.

112. The DreamDrive 2 platform suite of hardware includes an array of sensors on all sides—23 in DreamDrive 2 Premium and 34 in DreamDrive 2 Pro—including short- and long-range radar and ultrasonic sensors. DreamDrive 2 Pro also adds forward-facing LiDAR to detect objects and determine their speed and trajectory. Data from these sensors is processed by onboard computers to help steer, manage speed and following distance, and provide alerts for potential hazards or dangerous driving conditions.[18]

---

[17] [17] Form 10-K, Lucid Group, Inc., Annual report for year ending December 31, 2025, pp. 10, 12 (February 24, 2026).

[18] https://lucidmotors.com/knowledge/vehicles/gravity/lucid-gravity-in-depth/dreamdrive2-for-gravity (accessed Sept. 11, 2026).



113. Lucid Gravity's DreamDrive 2 is also equipped with a system of interior and exterior cameras—6 in DreamDrive 2 Premium and 14 in DreamDrive 2 Pro. These cameras monitor the driver, capture both narrow and wide views around the vehicle, and power features such as 360-degree Surround View Monitoring. Using real-time data, the cameras provide support to the advanced driver assistance system.[19]

114. DreamDrive 2 (standard) includes: Adaptive Cruise Control, Speed Limit Assist, Traffic Sign Recognition, Automatic Emergency Braking w/ Intersection Assist, Lane Departure Protection, Front & Rear Cross Traffic Protection, Rear Pedestrian Collision Protection, 3-Lane Visualization, Park Distance Warning, Park Comfort Braking, Distracted Driver Alert, Drowsy Driver Alert, Blind Spot Monitoring w/ Active Intervention & Safe Exit Warning, Highbeam Assist, Rear View Monitoring, Surrounding Object Visualization, and Hands-on Level 2 Drive Assist.[20]

115. DreamDrive 2 Premium includes all the features of DreamDrive 2, and additionally includes Blind Spot Display, Adaptive Drive Beam, 3D Surround View Monitoring, Enhanced Hands-on Drive Assist, See-Through Vehicle Display, and Automatic Park In/Out.[21]

[19] *Id.*
[20] https://lucidmotors.com/compare (accessed Sept. 11, 2026).
[21] *Id.*

116. DreamDrive 2 Pro includes all the features of DreamDrive 2 Premium, and additionally includes Hands-Free Drive Assist, Traffic Light Detection, Remote Automatic Parking (Level 2), Enhanced Automatic Park In/Out (Line Based), and Automatic Park In (Diagonal Space).[22]

117. Lucid's Hands-Free Drive Assist is powered by both software and sensors integrated into the Lucid vehicle. Hands-Free Drive Assist "is a suite of features that work together on certain roads." Hands-Free Drive Assist helps drivers steer and keep the vehicle centered in the driving lane, without touching the steering wheel. Hands-Free Drive Assist detects forward vehicles in a driving lane and adjusts speed to maintain a safe distance, which can be configured using a "Following Distance" button.

118. When a driver wants to change lanes, Hands-Free Lane Change Assist automatically steers the vehicle into the adjacent lane when it is safe to do so after the driver has activated the turn signal.

119. Active Curve Speed Control slows the vehicle automatically when driving in a curve, then resumes the previously set speed, even when hands-free driving isn't available.

120. If traffic comes to a stop while Hands-Free Drive Assist is active, Extended Stop & Go will automatically resume Drive Assist when traffic starts moving again.

121. If lane markings are difficult to detect due to traffic, built-in Traffic Jam Assist lets the driver use hands-on Drive Assist by following the vehicle in front of the Lucid vehicle.[23] Hands-Free Drive Assist, including Lane Change Assist and Extended Stop & Go are pictured below:

---

[22] *Id.*
[23] https://lucidmotors.com/knowledge/vehicles/air/lucid-air-in-depth/dreamdrive (accessed Sept. 11, 2026).






122. DreamDrive's Adaptive Cruise Control maintains the vehicle's speed and uses real-time data from exterior sensors to detect vehicles in front of the Lucid vehicle. When a slower vehicle is detected, it automatically adjusts speed to match, ensuring that the Lucid vehicle maintains a safe following distance. This distance can be adjusted to a driver's preference using the Following Distance Button on the steering wheel. When the vehicle is no longer detected, the Lucid vehicle will resume the original set speed. Adaptive Cruise Control will also adjust speed automatically when driving on curved roads to maintain a safe lane position. Adaptive Cruise Control is pictured below:




123. DreamDrive also includes a suite of Collision Detection features to help avoid or reduce the severity of a collision. These features include Forward Collision Warning, Front Automatic Emergency Braking, and Rear Pedestrian Collision Protection. The sensitivity of this protection can be customized to Early, Normal, or Late and will apply the brakes if it detects that a collision is imminent.

124. Forward Collision Warning uses the Lucid vehicle's front exterior camera and radar to detect objects ahead of the vehicle while driving and to alert the driver to brake to avoid or reduce the severity of a collision. Automatic Emergency Braking will initiate braking automatically to try to avoid or reduce the severity of impact if an object or road user is detected in front of the vehicle.






125. Rear Pedestrian Collision Protection uses the rear exterior camera to check for pedestrians behind the vehicle whenever backwards motion is detected, even if the vehicle is in Drive. It will warn the driver, then apply the brakes automatically to try to avoid or reduce the severity of a collision.



126. Lane Departure Protection detects both lane lines and road edges to help keep the vehicle in the driving lane. If it senses that the vehicle has started to stray from the lane, it provides a visual alert on the Glass Cockpit. If it does not detect the driver steering back into the lane, the steering wheel will vibrate, and if it still doesn't detect that you are steering back into the lane, corrective steering will engage.



127. Cross Traffic Protection uses the side radars to check for vehicles driving in front of or behind the vehicle and, if one is detected, warns the driver and activates Automatic Emergency Braking to try to avoid or reduce the severity of a collision.



128. DreamDrive also includes Distracted Driver Alert and Drowsy Driver Alert, which monitor the driver's actions inside the vehicle. Distracted Driver Alert uses the vehicle's driver camera to detect whether the driver's eyes are on the road. If the camera senses lengthy glances away from the road, a chime will sound, and an alert will appear on the Glass Cockpit. If further distracted driving is detected, the steering wheel will vibrate to remind the driver to keep eyes on the road. Drowsy Driver Alert checks for signs of drowsy driving, such as eye closure and abnormal driving behavior. If these are detected, a chime will sound and an alert will appear on the Glass Cockpit. If the vehicle continues to detect drowsy driving, it will suggest a rest stop and display potential places to take a break on the Glass Cockpit that you can navigate to.



## LUCID'S KNOWLEDGE OF HONEYWELL AEROSPACE'S PATENTS AND OF ITS INFRINGEMENT

129. On April 17, 2023, counsel for Honeywell Aerospace sent a detailed written notice to Lucid. The April 2023 Letter identified numerous patents by number and title, enclosed a copy of each, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringed.

130. Detailed claim charts were provided regarding several of the patents identified, including the '264 Patent. That claim chart mapped the language of an exemplary claim to specific functionality in specific Lucid products — including Lucid's DreamDrive driver-assistance suite as offered in the Lucid Air — and supported that mapping with citations to Lucid's own published materials, including Lucid's DreamDrive product and technology pages, together with publicly available demonstrations of the accused features in operation.

131. The April 2023 Letter further enclosed a list of additional Honeywell Aerospace patents identified as relevant to, and as reading on, Lucid's products. That list included the remaining Patents-in-Suit, including the '062 Patent, the '816 Patent, the '567 Patent, the '856 Patent, the '334 Patent, and the '352 Patent.

132. The April 2023 Letter asked Lucid to confirm receipt by April 24, 2023, and to provide a formal response by May 1, 2023.

133. On May 17, 2023, Lucid responded through outside counsel. Lucid asserted that it did not require a license. But Lucid did not identify any limitation of any claim of the '264 Patent that its products do not practice, and Lucid did not address any of the additional Honeywell Aerospace patents identified in the April 2023 Letter.

134. The parties conferred regarding the matter in August 2024.

135. On December 3, 2024, Honeywell Aerospace again wrote to Lucid. The December 2024 Letter memorialized the parties' discussion, restated that Lucid's vehicles infringed the patents identified in 2023, and explained that the claims of the '264 Patent are practiced by any vehicle that provides driver-assistance features of the type Lucid markets in DreamDrive, including lane-centering assistance and automatic emergency braking. The December 2024 Letter further noted that Lucid had not identified any claim limitation that its vehicles do not practice.

136. The December 2024 Letter identified additional Honeywell Aerospace patents that Lucid infringes, including the '062 Patent and the '567 Patent, and enclosed an evidence-of-use claim chart for each.

137. The December 2024 Letter stated that Honeywell Aerospace sought compensation for Lucid's past use of the claimed inventions as well as for continued use.

138. On December 20, 2024, Lucid responded through outside counsel that its position was substantially unchanged and that it did not require a license to the additional patents identified in the December 2024 Letter. Lucid again did not identify any limitation of any claim of any Patent-in-Suit that its products do not practice. Lucid proposed to gather additional information and to return to the discussion after the start of the new year. Lucid never provided any further substantive response to Honeywell Aerospace's infringement allegations.

139. Lucid has therefore had actual knowledge of all Patents-in-Suit no later than April 2023, and of the claim-by-claim bases for infringement of the '264 Patent, the '062 Patent, and the '567 Patent no later than December 2024, and has had actual knowledge that Lucid's products infringe such patents. Across nearly two years of correspondence, Lucid never identified a single claim limitation that its products do not practice, much less provided any reason why it does not infringe. Instead, Lucid continued to make, use, sell, offer for sale, and import components and

vehicles that practice the Patents-in-Suit. Lucid also developed and released new products and features that practice the Patents-in-Suit.

**COUNT I:**
**INFRINGEMENT OF THE ’264 PATENT**

140. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

141. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’264 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’264 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

142. As set forth in detail in Exhibit O, the Accused Instrumentalities infringe at least claim 1 of the ’264 patent.

143. Lucid practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Lucid uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of the Lucid DreamDrive platform feature.[24]

144. In view of the foregoing, Lucid has infringed and continues to infringe the ’264 patent in violation of 35 U.S.C. § 271.

---

[24] https://www.youtube.com/watch?v=MTbL0-t8xDk

145. Lucid has had knowledge of the ’264 patent and that its activities infringe the ’264 patent before the filing of this action.

146. Lucid has had actual knowledge that its activities infringe the ’264 patent since at least April 20, 2023, when Honeywell Aerospace served on Lucid a copy of the ’264 patent and a claim chart mapping the limitations of claim 1 of the ’264 patent to functionality in DreamDrive.

147. Despite its notice of the ’264 patent, Lucid takes active steps to knowingly induce infringement of the ’264 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

148. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’264 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’264 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

149. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, inter alia, damages adequate to compensate Honeywell Aerospace for Lucid’s direct

and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’264 patent by Lucid, together with interest and costs.

150. Despite having actual notice of the ’264 patent, Lucid has and continues to willfully infringe the ’264 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## COUNT II: INFRINGEMENT OF THE ’062 PATENT

151. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

152. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’062 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’062 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

153. As set forth in detail in Exhibit P, the Accused Instrumentalities infringe at least claim 1 of the ’062 patent.

154. In view of the foregoing, Lucid has infringed and continues to infringe the ’062 patent in violation of 35 U.S.C. § 271.

155. Lucid has had knowledge of the ’062 patent and that its activities infringe the ’062 patent before the filing of this action.

156. Lucid has had actual knowledge of the ’062 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’062 patent to Lucid by number and title, and advised

Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace's patents.

157. Lucid has had actual knowledge that its activities infringe the '062 patent since at least December 3, 2024, when Honeywell Aerospace served on Lucid a claim chart mapping the limitations of claim 1 of the '062 patent to identified functionality of DreamDrive in Lucid's vehicles.

158. Lucid's response to the December 3, 2024 Letter never identified any limitation of claim 1 of the '062 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the '062 patent is invalid or not infringed. Lucid instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

159. Despite its notice of the '062 patent, Lucid takes active steps to knowingly induce infringement of the '062 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

160. In addition, Lucid has indirectly infringed and continues to indirectly infringe the '062 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing

use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’062 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

161. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Lucid’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’062 patent by Lucid, together with interest and costs.

162. Despite having actual notice of the ’062 patent, Lucid has and continues to willfully infringe the ’062 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## COUNT III: INFRINGEMENT OF THE ’352 PATENT

163. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

164. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’352 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’352 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

165. As set forth in detail in Exhibit Q, the Accused Instrumentalities infringe at least claim 1 of the ’352 patent.

166. Lucid practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Lucid uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of the Lucid DreamDrive platform feature.[25]

167. In view of the foregoing, Lucid has infringed and continues to infringe the ’352 patent in violation of 35 U.S.C. § 271.

168. Lucid has had knowledge of the ’352 patent and that its activities infringe the ’352 patent before the filing of this action.

169. Lucid has had actual knowledge of the ’352 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’352 patent to Lucid by number and title, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

170. Despite its notice of the ’352 patent, Lucid takes active steps to knowingly induce infringement of the ’352 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

171. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’352 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused

[25] https://www.youtube.com/watch?v=MTbL0-t8xDk

Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’352 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

172. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, inter alia, damages adequate to compensate Honeywell Aerospace for Lucid’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’352 patent by Lucid, together with interest and costs.

173. Despite having actual notice of the ’352 patent, Lucid has and continues to willfully infringe the ’352 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## COUNT IV:
## INFRINGEMENT OF THE ’816 PATENT

174. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

175. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’816 patent, including but not limited to claim 14, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’816 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles

operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

176. As set forth in detail in Exhibit R, the Accused Instrumentalities infringe at least claim 14 of the ’816 patent.

177. In view of the foregoing, Lucid has infringed and continues to infringe the ’816 patent in violation of 35 U.S.C. § 271.

178. Lucid has had knowledge of the ’816 patent and that its activities infringe the ’816 patent before the filing of this action.

179. Lucid has had actual knowledge of the ’816 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’816 patent to Lucid by number and title, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

180. Despite its notice of the ’816 patent, Lucid takes active steps to knowingly induce infringement of the ’816 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

181. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’816 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or

aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’816 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

182. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, inter alia, damages adequate to compensate Honeywell Aerospace for Lucid’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’816 patent by Lucid, together with interest and costs.

183. Despite having actual notice of the ’816 patent, Lucid has and continues to willfully infringe the ’816 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## COUNT V: INFRINGEMENT OF THE ’334 PATENT

184. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

185. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’334 patent, including but not limited to claim 13, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’334 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

186. As set forth in detail in Exhibit S, the Accused Instrumentalities infringe at least claim 13 of the ’334 patent.

187. In view of the foregoing, Lucid has infringed and continues to infringe the ’334 patent in violation of 35 U.S.C. § 271.

188. Lucid has had knowledge of the ’334 patent and that its activities infringe the ’334 patent before the filing of this action.

189. Lucid has had actual knowledge of the ’334 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’334 patent to Lucid by number and title, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

190. Despite its notice of the ’334 patent, Lucid takes active steps to knowingly induce infringement of the ’334 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

191. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’334 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that

infringes the ’334 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

192. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, inter alia, damages adequate to compensate Honeywell Aerospace for Lucid’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’334 patent by Lucid, together with interest and costs.

193. Despite having actual notice of the ’334 patent, Lucid has and continues to willfully infringe the ’334 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## COUNT VI: INFRINGEMENT OF THE ’567 PATENT

194. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

195. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the ’567 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’567 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

196. As set forth in detail in Exhibit T, the Accused Instrumentalities infringe at least claim 1 of the ’567 patent.

197. Lucid practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Lucid uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of the Lucid DreamDrive platform feature.[26]

198. In view of the foregoing, Lucid has infringed and continues to infringe the ’567 patent in violation of 35 U.S.C. § 271.

199. Lucid has had knowledge of the ’567 patent and that its activities infringe the ’567 patent before the filing of this action.

200. Lucid has had actual knowledge of the ’567 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’567 patent to Lucid by number and title, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

201. Lucid has had actual knowledge that its activities infringe the ’567 patent since at least December 3, 2024, when Honeywell Aerospace served on Lucid a claim chart mapping the limitations of claim 1 of the ’567 patent to identified functionality of DreamDrive in Lucid’s vehicles.

202. Lucid’s response to the December 3, 2024 Letter never identified any limitation of claim 1 of the ’567 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’567 patent is invalid or not infringed. Lucid instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

---

[26] https://www.youtube.com/watch?v=MTbL0-t8xDk

203. Despite its notice of the ’567 patent, Lucid takes active steps to knowingly induce infringement of the ’567 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

204. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’567 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’567 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

205. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Lucid’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’567 patent by Lucid, together with interest and costs.

206. Despite having actual notice of the ’567 patent, Lucid has and continues to willfully infringe the ’567 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell

Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT VII: INFRINGEMENT OF THE '856 PATENT

207. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

208. In violation of 35 U.S.C. § 271, Lucid has infringed and/or induced others to infringe one or more claims of the '856 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '856 patent. These products include at least Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform, including DreamDrive, DreamDrive Premium, DreamDrive Pro, DreamDrive 2 Premium, and DreamDrive 2 Pro.

209. As set forth in detail in Exhibit U, the Accused Instrumentalities infringe at least claim 1 of the '856 patent.

210. Lucid practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Lucid uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of the Lucid DreamDrive platform feature.[27]

211. In view of the foregoing, Lucid has infringed and continues to infringe the '856 patent in violation of 35 U.S.C. § 271.

[27] https://www.youtube.com/watch?v=MTbL0-t8xDk.

212. Lucid has had knowledge of the ’856 patent and that its activities infringe the ’856 patent before the filing of this action.

213. Lucid has had actual knowledge of the ’856 patent since at least April 17, 2023, when Honeywell Aerospace identified the ’856 patent to Lucid by number and title, and advised Lucid that Lucid was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

214. Despite its notice of the ’856 patent, Lucid takes active steps to knowingly induce infringement of the ’856 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Lucid Air sedan and Lucid Gravity SUV vehicles operating one or more versions of the Lucid DreamDrive platform.

215. In addition, Lucid has indirectly infringed and continues to indirectly infringe the ’856 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’856 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

216. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Lucid's direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the '856 patent by Lucid, together with interest and costs.

217. Despite having actual notice of the '856 patent, Lucid has and continues to willfully infringe the '856 patent in disregard of Honeywell Aerospace's rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Honeywell Aerospace hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Honeywell Aerospace respectfully requests that this Court:

a) Enter judgment in favor of Honeywell Aerospace and against Lucid;

b) Enter judgment that Lucid has willfully infringed one or more claims of each Patent-in-Suit;

c) Preliminarily and permanently enjoin Lucid and those in concert with it from further infringement of any claim of any Patent-in-Suit;

d) Award Honeywell Aerospace damages in an amount sufficient to compensate it for Lucid's infringement of one or more claims of each Patent-in-Suit, together with pre-judgment and post-judgment interest, costs, and all other damages permitted under 35 U.S.C. § 284;

e) Declare that this is an exceptional case within the meaning of 35 U.S.C. § 285;

f) Award Honeywell Aerospace its costs in this action, together with reasonable attorneys' fees and pre-judgment and post-judgment interest;

g) Perform an accounting of Lucid's infringing activities through trial and judgment;

h) Statutory damages, including multipliers and equitable enhancements, as permitted by law; and

i) Award Honeywell Aerospace such other and further relief, including other monetary and equitable relief, as this Court deems just and proper.

Dated: September 18, 2026

Respectfully submitted by:

*/s/ Melissa R. Smith*

Melissa Smith
GILLAM & SMITH LLP
303 South Washington Avenue
Marshall, TX 75670
Tel: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

Brent P. Ray
ARNOLD & PORTER KAYE SCHOLER LLP
811 Main St., Suite 1800
Houston, TX 77002
Tel: 312-583-2325
Brent.Ray@arnoldporter.com

Matthew Wolf
Nicholas M. Nyemah
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5462
Fax: 202-942-5999
Matthew.Wolf@arnoldporter.com
Nicholas.Nyemah@arnoldporter.com

Patrick Reidy
Brian E. Haan (*pro hac* forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
300 North LaSalle Drive, Suite 3500
Chicago, IL 60654

Tel: 312-583-2424Re
Fax: 312-583-2360
Patrick.Reidy@arnoldporter.com
Brian.Haan@arnoldporter.com

***Attorneys for Honeywell Aerospace US LLC***